Carlos Morales FELICIANO et al., Plaintiffs,

v.

Carlos Romero BARCELO et al., Defendants.

Civ. No. 79–4.

United States District Court, D. Puerto Rico.

Jan. 3, 1979.

Harvey B. Nachman, Santurce, P. R.,
Servicios Legales de P. R., Inc., Río Piedras,
P. R., for plaintiffs.

Raúl Juan Escudero, Dept. of Justice, San
Juan, P. R., Robert B. Donnin, Mayda Colón
Tsaknis, Puerto Rico Federal Affairs Ad-
ministration, Washington, D. C., for defend-
ants.

## OPINION AND ORDER

PEREZ–GIMENEZ, District Judge.

This action involves the alleged violations of the rights of prisoners and pre–trial detainees confined by the Administration of Correction of the Commonwealth of Puerto Rico. This type of case has grown as rivers grow–deeper, wider and with a crescendo of speed and noise as they approach the oceans. This watercourse has not sprouted overnight, but has developed through the years from a small creek to its present size.[1] The instant action is as ambitious an action as we have seen reported anywhere. The entire correctional system of the Commonwealth is challenged on the ground that it violates the due process rights, the equal protection rights, the rights of free association, and the right of access to the courts, as well as the right to be free or rid of cruel and unusual punishment.

Plaintiffs are all persons incarcerated under the custody of the Administrator of Correction and the defendants are the Governor of the Commonwealth of Puerto Rico, the Administrator of Correction and the present and some former members of the Parole Board of the Commonwealth of Puerto Rico. The action was filed in early 1979, but has a genealogy of other class actions previously filed and decided by this Court.[2]

---

1. Because of the nature of the Emergency and Extraordinary Relief requested by Plaintiffs, the Court was very restrained in allowing evidence on the record of past violations. Nevertheless, a trickle of testimony made its way into the record which evinces that the genesis of the present conditions of confinement has its roots in years gone by. The thrust of the evidence presented covered the years 1977-78, 1978–79, and 1979–80. Yet, even at least since 1960 the inmates at the State Penitentiary were receiving very deficient medical, psychiatric and therapeutic treatment; were complaining of receiving cruel and inhuman punishment; and throughout the system the inmates were living in subhuman conditions, which "... did not begin three years ago ...". (Cruz de Batista, T. 1834-35, 1837–38, 1879). See also footnote 2, infra.

2. *Efraín Montero Torres v. Rafael Hernández Colón*, Civil 75–828, filed by the inmates of La Pica, one of the minimum security camps, ended by stipulation and order requiring the Administrator of Correction to provide the Parole Board with psychological and other information that it was legislatively ordered to amass so that the Parole Board would be in position to act. In essence, the prisoners were being deprived of statutory due process and equal protection of the laws when parole eligible prisoners were denied consideration for parole when the Parole Board could not decide their case for lack of information.

The *Montero Torres* case was reopened by a pro se intervenor in 1977. *Roberto Morales Escudero* had his intervention transformed into a class action which attacked the gamut of parole procedures. The critical event in that case was a scheduled hearing to hold the former and present Governors, the present and former Administrators of Correction and the former and then current members of the Parole Board in contempt for violation of the Order entered in the *Montero Torres* case. As the then Magistrate, the Court acted as mediator of an eight–day settlement conference that ended in another stipulation and order that was detailed as to each step and requirement of the parole deciding process. Substantial fees were awarded court–appointed counsel who, with one addition, are the same corps of attorneys representing plaintiffs in this case.

The *Morales Escudero* order was followed by another class–action intervention, that of *Juan Serrano Martínez*, which also ended by stipulation and order, refining the procedures set down in the *Morales Escudero* order of October 1, 1977, and requiring specific standardization of action by the prison authorities in classification and treatment of prisoners for parole purposes. This was followed by yet another action to hold named defendants in contempt for failure to comply with orders of this Court, the intervention of *Pedro Jiménez Alvarado*. That action was tried and a fine assessed if compliance were not made by a date certain.

Another class action by federal prisoners claiming that their Eighth Amendment Rights were violated by their conditions of confinement in the now extinct "La Princesa" was settled by the federal authorities removing pretrial detainees and prisoners to the State Penitentiary. But then the state prisoners brought suit and a trial was had, and that particular institution was ordered closed. *Martínez Rodríguez v. Jiménez*, 409 F.Supp. 582 (D.P.R., 1976), affirmed on petition for a stay order, 537 F.2d 1 (1 Cir., 1976). The State Penitentiary then was voluntarily closed for repairs and remodeling after successive suits claiming intolerable conditions of confinement, first by federal inmates and then by Commonwealth prisoners. The federal prisoners successfully closed Bayamón Regional Institution insofar as they only were concerned, and the federal female prisoners have had their lot improved at

After nearly a year and a half of extensive discovery, most of which was bitterly contested, the plaintiffs procured orders to distribute questionnaires, to have experts visit selected institutions and to take both motion pictures and still photographs of the institutions. The picture taking was governed by stringent regulations to prevent any possibility of either public disclosure or revelation of prison security. With the pictures and reports of the experts, the plaintiffs moved for a Preliminary Injunction and for Emergency, Provisional and Extraordinary Relief. That motion was accompanied by affidavits from five experts,[3] the qualifications of whom were uncontested; portions of the depositions of the Administrator of Correction; and, copies of various Standards or Draft Standards of national organizations or governments.[4]

Convinced that a prima facie showing had been made in relation to basic health and custodial care, this Court issued an Order to Show Cause on May 9, 1980, directing the defendants to file, if they so desired, a response to the Motion for Preliminary Injunction not later than May 21, 1980, and that the hearing on the Show Cause Order commence on May 27, 1980. The plaintiffs requested emergency relief in nine designated areas:

1. To close the "calabozos" or dungeons to human occupation;

2. To transfer all known psychotics or other definable mentally ill inmates out of the prison system into mental hospitals or other institutions designed to treat such persons;

3. To screen all incoming inmates, whether convicted persons or pretrial detainees, to separate the psychotics for removal;

4. To screen the entire prison population for contagious, infectious, respiratory and venereal diseases and for such other physical conditions such as epilepsy, diabetes, blood pressure, liver disorders, and to continue to do such screening of every inmate admitted to the system in the future;

5. To reduce the population of every institution under the authority of the Administrator of Correction to a number compatible with minimum physical and mental health standards;

6. To provide each inmate with a personal living space of at least seventy (70) square feet and at least five (5) hours a day outside of such confinement;

7. To provide each inmate who requires, a special diet for medical or religious reasons, with such a diet;

8. To provide (or to advise the Court what was needed to so provide) with staff, facilities and supplies necessary to deliver adequate health care and adequate sanitation to all the institutions operated by or under the authority of the Administration of Correction;

9. Provide a psychological and psychiatric screening of all persons confined in the institutions.

The Court heard a total of 45 witnesses, carefully scrutinized all the exhibits admitted into evidence, including the four hundred (400) photographs, the selected medical and psychological records, the motion pictures of each of the closed institutions and of Sabana Hoyos Prison Camp, and all the papers filed by the attorneys for the parties. In addition to the thousands of pages

---

the Vega Alta Industrial School for Women. Both these institutions still house local prisoners.

All of these later cases concerning conditions of confinement have ended with the plaintiff prevailing by last minute settlement stipulation. The present action seeks for the first time Island–wide equitable and injunctive relief for ten separate claims for relief, including conditions of confinement. It also seeks damages for individual intervening prisoners whose particular rights are alleged to have been violated.

3. Four of the five experts testified during the hearing and their testimony will be properly identified below.

4. The Draft Standards of the Federal Department of Justice and the American Medical Association Standards for Jails. Allusion has been made by various witnesses to other standards and the American Correctional Standards and American Bar Association Standards have also been checked by the Court.

of documentary evidence, the Court has re-read the transcript of proceedings of nearly 3,000 pages and all of the cases cited by the parties. The Court cannot delay any further this ruling.

The Administration of Correction of the Commonwealth of Puerto Rico is an integrated system structured by statute to find effective ways of providing individualized treatment to foster rehabilitation. 4 L.P.R.A. 1111, 1112.[5] The legislature of Puerto Rico recognized its obligation of providing adequate medical care and hospital services. 4 L.P.R.A. 1112(f). Rehabilitation and humanitarian treatment is mandated not only in the organizing statute, 4 L.P.R.A. 1111–1125, inclusive, but in a number of the provisions of the Constitution of Puerto Rico. Article II, Section 1; Article II, Section 7; Article II, Section 11; Article II, Section 12; and Article VI, Section 19.

Because the Court finds that the defendants have so blatantly violated the federal Constitution's interdiction against cruel and unusual punishment, it becomes unnecessary to pass upon the plaintiffs' various claims of denials of due process, of statutory due process, or of equal protection of the laws. The importance of these statutes heretofore mentioned is that they negate any local or state justification or mitigating circumstances. Puerto Rico, by its laws, recognizes its duty and obligations to its prisoners and pre–trial detainees.[6] The statutory obligations imposed upon the executives of the local government are more exacting than the reported decisions on the minimum quality of treatment required by the Eighth Amendment. There is no justification for the cruel and brutalizing conditions and treatment that the penal and pre–trial populations of Puerto Rico's prisons are compelled to endure. What has been shown the Court might be incredible to a naive person who accepted the presumption that legal duties are followed were it not for the fact that all these horrors have been preserved on film and frequently, in the records or lack of records of the several institutions.

Psychotic mad men are kept for weeks and months, (some pre–trial detainees) caged like animals, without clothes, without toilet facilities, without medicines, forced to eat with their hands and in most cases without ever having been seen by a doctor. Others, presumably sane, seeking asylum from threats of death or serious injury in the general penal population, lose all their privileges, all programs for possible rehabilitation, all chance for parole, all recreation, while they are locked in dungeons called "calabozos".

Prisoners and pre–trial detainees die from lack of medical treatment. Epileptics inflict upon themselves or suffer injuries which are too often fatal. Suicides are alarmingly frequent, but not so staggering to the mind as the number of violent deaths that the Court has reviewed. Raw sewage runs in dormitories and kitchens; toilets in all closed institutions do not work; prescriptions do not get filled; bed and mattresses are not provided; nor, for that matter is soap, toothpaste or toothbrushes, or sufficient toilet paper. Food has to be destroyed everywhere because it has been contaminated by rats or other vermin. Usually, people cannot see a doctor unless the prison guards acquiesce. They cannot be sent to a hospital if ordered by a physician unless there are enough prison guards available. There is no screening of incoming inmates and apart from check–ups made every six months by federal authorities for venereal disease, many prisoners never see a physician or are they given a medical examination. The only psychiatric screening that the overwhelming number of inmates receive is the untrained subjective evaluation of the prison guard. Overcrowding, the basic evil of each closed institution, is so intense that in some areas, such as the "Q" or quarantine section of the Bayamón

---

**5.** Law 116 of July 22, 1974.

**6.** The right of convicted persons to humane treatment is not eschewed by reason of their confinement. They are guaranteed the provision of life's basic needs for the period of their incarceration. *Bowring v. Godwin*, 551 F.2d 44 (4 Cir., 1977).

Regional Institution, where pre–trial detainees constitute the overwhelming majority, the inmate may have no more than fifteen (15) square feet of living space.

This evidence presented by the plaintiffs was not controverted. Defendants and their experts admitted all these shortcomings, as did the witnesses who were subpoenaed from the Administration of Correction. An emergency exists. The fundamental Constitutional guarantees of these prisoners have been and are being violated daily. The Court cannot, in view of the evidence, and the fact that half–hearted attempts to correct anything have only been made at the eleventh hour, most of them during the hearing, stay its hand or defer to the local authorities.[7] The Court accepts its jurisdiction and its responsibility. An injunction shall issue.

### Findings of Fact

1. The Administration of Correction is a governmental agency that operates all the institutions where pre–trial detainees are kept and convicted persons are housed. It is an integrated agency.

2. There are nineteen (19) institutions in all, ten (10) of them designated as closed institutions: Aguadilla, Arecibo, Ponce, Guayama, Bayamón, Humacao, Vega Alta Industrial School for Women, Miramar Young Adults Institution, the Intensive Treatment Unit at Río Piedras, and the San Juan Municipal Jail.[8]

The Intensive Treatment Unit at Río Piedras presently houses prisoners who are almost all classified as maximum custody prisoners. They are kept in individual cells and although there have been visits by experts, and testimony about conditions, the situation there is not comparable to the situation at the other closed institutions. Likewise, the testimony concerning the San Juan Municipal Jail has been so meager that no specific findings will be made concerning that institution.[9]

3. Each of the other closed institutions has a budget for food, medicines, linens, supplies, and said budget is administered by the superintendent of the respective institution. The distribution of medicines, the transfer of inmates and the supervision of medicines, repairs and other functions are all assumed by the central office, which also coordinates all medical services and prepares contracts with individual physicians.

The bases for the following findings are principally the motion pictures and still photographs that the Court examined and the testimony of the several superintend-

7. The Court is aware that substantial deference to prison officials is required. *Bell v. Wolfish*, 441 U.S. 520, 99 S.Ct. 1861, 60 L.Ed.2d 447 (1979); *Procunier v. Martínez*, 416 U.S. 396, 94 S.Ct. 1800, 40 L.Ed.2d 224 (1974); *Jones v. North Carolina Prisoners' Labor Union, Inc.*, 433 U.S. 119, 97 S.Ct. 2532, 53 L.Ed.2d 629 (1977). But this policy cannot interfere with the duty to protect constitutional rights. *Procunier v. Martínez, supra; Cruz v. Beto*, 405 U.S. 319, 92 S.Ct. 1079, 31 L.Ed.2d 263 (1972). Government entities have no discretion to violate the Constitution. *Owen v. City of Independence, Missouri*, 445 U.S. 622, 100 S.Ct. 1398, 63 L.Ed.2d 673 (1980). Once a court finds that an Eighth Amendment violation exists, it is obligated to remedy the situation. *Estelle v. Gamble*, 429 U.S. 97, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976); *Battle v. Anderson*, 564 F.2d 388, 392–393 (10 Cir., 1977); *Gregg v. Georgia*, 428 U.S. 153, 96 S.Ct. 2909, 49 L.Ed.2d 859 (1976); *Smith v. Sullivan*, 611 F.2d 1039, 1044 (5 Cir., 1980); *Hutto v. Finney*, 437 U.S. 678, 98 S.Ct. 2565, 57 L.Ed.2d 522 (1978); *Ramos v. Lamm*, 485 F.Supp. 122 (D.Colo., 1979).

8. Testimony concerning the first eight of these institutions will be reviewed in these Findings of Fact. The Court compelled the parties to present evidence concerning conditions in the several institutions separately, in case certain remedies were to be ordered against specific institutions, or, in the case the Court were to find that the system was not an integrated one.

9. The State Penitentiary at Río Piedras has been shut down for repairs during the pendency of this lawsuit. The defendants' witnesses have referred to the reopening of that institution as if that opening would magically eliminate all the violations and solve all the problems of the penal system. The State Penitentiary will reopen on September 3, 1980, but the Court can make no findings as to how much that reopening will alleviate any of the problems in the other closed institutions. As of the date of the hearing ended, there was no evidence as to what kind of prisoners would be housed in the reopened facilities.

ents. Whenever the testimony of an expert is used as a basis for a finding, the name of the expert and the transcript reference will be given.

4. The Aguadilla Regional Jail is so old that its date of construction is unknown, but it was probably built before the turn of the century. Except for female prisoners, it houses pretrial detainees, young adult offenders and convicted criminals of every custodial classification. At one time, this institution only had 90 beds, which appears to be too many for the interior space. About one year ago, its "rated capacity" was raised by the Administration of Correction to 125 inmates. At the time that rating was made by the central office of the Administration, there were already 148 beds occupied. On June 4, 1980, 182 inmates were housed at Aguadilla, and there have been on occasion as many as 215 inmates.

5. This overcrowding has made it impossible for the superintendent to put prisoners to work who are entitled to reduce their sentences by productive labor because there is insufficient space. The space restriction makes use of the only available recreation area, the inner patio of less than 848 square feet, unavailable for exercise or recreation until after 4:00 P.M. To accommodate all the inmates, the space is used on a rotation basis so that young adult offenders, for example, are able to exercise once a week.

6. Overcrowding at Aguadilla is, in part, a contributing cause for the occasional outbreaks of scabies and other skin infections. Screens, which are vitally needed to keep out flies, have not been installed because they would cut off the circulation of air. Even though there are insufficient beds, prisoners who sleep on the floor usually sleep on mattresses, but sometimes, there are insufficient mattresses and then inmates have to sleep either doubled or on the floor without mattresses.

7. The "calabozos" or dungeons or isolation cells, are primitive; they have no windows and as recently as a year ago, they had no toilet or wash basin. They became somewhat more liveable after the deposition of the superintendent had been taken. Two persons have recently died in the "calabozos" in Aguadilla, both of them pre-trial detainees. Both were placed there because they appeared mentally ill. One was a known alcoholic; the other was an unknown epileptic. Both died without receiving adequate medical attention and there was not even a medical file for the epileptic.

8. The "calabozos" have been used in Aguadilla only to house "psychotics" (as determined by the penal guards) or persons who seek asylum from physical harm in the general population of the prison.

9. There is another dormitory ward in Aguadilla where mentally ill, only, are kept. There are no psychiatric or medical facilities to tend to them; there is no psychiatrist who visits the institution. The medical care program in Aguadilla consists of a doctor who attends a total of six hours per week over a five-day period and earns $15.00 per hour. There is no full-time doctor, dentist, pharmacist or nurse, although a nurse was retained between the time of the superintendent's testimony and the testimony of the defendants' expert. There is no pharmacy, but there are medicines purchased with a total current annual budget of $750.00. There is no preventive medicine or dental program; no regular physical check-up; no vaccination program and no obligation on the part of the contract physician to attend to the emergencies. The medical files are inadequate; they have no regular entries; no memoranda from the contract physician; no sick call entries and no reports of physical examinations. New medical records for in-coming inmates are being made up by the superintendent at home.

10. There is in Aguadilla, however, a citizens' committee which provides medicines to inmates when needed, which helps with emergency medical problems and otherwise assists the superintendent whenever he calls up its members. In fact, the superintendent does not believe he could do without the committee. The superintendent has had contact with the coordinator of medical services from the central office of the Ad-

ministration of Correction, at most, on an average of once a year.

11. The experts were unanimous in praising the efforts made by the officials at Aguadilla to keep the place clean. But, only the defendants' expert felt that the use of the citizens' committee was a healthy sign. The Court finds that the Commonwealth cannot avoid its obligations in providing basic health services by reliance upon volunteer services.

12. The psychiatric treatment or lack of it, is disgraceful. On the date that the plaintiffs' psychiatric expert, Dr. Frank Rundle, visited Aguadilla, there were 205 inmates. (Rundle, T. 234). More than half of the persons in the dormitory for the mentally disturbed had to sleep on the floor on mattresses. (Rundle, T. 235). That dormitory had less than fifteen (15) square feet living space per person. (Rundle, T. 235). One person in "calabozo" was diagnosed as having organic brain syndrome (Rundle, T. 236); another in "calabozo" was there because he was allegedly mentally ill, but there was no medical history and no physical examination record. There were also no reports of alleged treatment at mental health clinics in Aguadilla, or at the Mayaguez Regional Hospital. (Rundle, T. 237–238).

13. The medicines were improperly organized. (King, T. 675). A recent epidemic of skin rashes had occurred. (King, T. 676). The sanitation facilities were not only broken or improper, there were an insufficient number for the persons incarcerated. (King, T. 677). The medical treatment and the medical record keeping was completely inadequate. (King, T. 678–679). The heat in Aguadilla is unbearable and that, plus the lack of facilities and the overcrowding, makes inevitable that deterioration is the only effect for the mentally ill inmates. (Díaz–Royo, T. 1696).

14. The conditions of overcrowding and lack of facilities were not contested by the defendants' expert. (Hastings, T. 2651–2652). The superintendent himself was of the opinion that the mentally ill should be out of "calabozos" and out of the prison into a psychiatric hospital. (T. 1073–1074). He sees no need for "calabozos" at all. (T. 1073).

15. The Arecibo District Jail is 75 years old and houses both pre–trial and convicted inmates. Although the "rated capacity" is 220 inmates, that number has been constantly exceeded for the past three years. Some inmates sleep without beds, and articles of personal hygiene are not supplied. There are no facilities at the institution for psychiatric or dental care or X–rays. There is no laboratory or pharmacy or pharmacist, but there is a $700.00 budgetary allowance for medicines.

16. Medical services are provided by a doctor who comes five hours a week. There is no provision for medical assistance on week–ends. The medical records are poorly kept, and there is no effort to take physical histories, make or record physical examinations, nor are the results of TB screening or sick–call notes placed in the individual charts.

17. The "calabozos" at Arecibo are like cages with bars on the top. Suicides have occurred there. There is at least one case of a man being housed in a "calabozo" for more than one year. Individual "calabozos" are frequently used for two or more persons at a time. All severely mentally ill are placed in "calabozos" in Arecibo.

18. Like the other institutions, there is no hot water in the dormitory areas. Adult and young offenders are frequently housed together and there have been at least three inmate deaths during the past year, and in none of the cases could it be said that adequate medical treatment was given.

19. There is no privacy at sick calls. (King, T. 649). The organization of medicines is haphazard and many medicines are kept beyond their expiration date. (King, T. 649). Medical records are so poorly organized that charts concerning one inmate may be found inside the files of another man. (King, T. 649–651). There is no first aid kit, no laboratory tests, no emergency equipment at all. (King, T. 651–653). There are no charts for nine of the ten

psychotics that were in "calabozos". (King, T. 655). The medical records are totally inadequate. (Hastings, T. 2784).

20. The persons in "calabozo" are markedly agitated and disoriented. (King, T. 655). The "calabozos" are contraindicated for potential suicides. Because of the way the "calabozos" are constructed, it is easy for a person to hang himself. (Hastings, T. 2786).

21. The stench from the overcrowding throughout the institution is omnipresent. (Díaz–Royo, T. 1679).

22. The Ponce Regional Institution was built in 1849. Young adults, pretrial detainees and all custody classifications for convicted prisoners are housed at Ponce. Occasionally, women pre–trial detainees are housed there as well. The superintendent had no idea of the capacity (but Dr. Hastings was advised that the "capacity" was 250). That "rating" was not made by any standard acceptable to the American Correctional Association. (Hastings, T. 2789). There were on the date of Dr. Hastings' visit, 404 inmates. (Hastings, T. 2789). The number of toilets, showers and wash basins are totally inadequate. The institution is horribly overcrowded. People are sleeping on the floor everywhere. The budget at Ponce for repairs was less in 1979/80 than it was in 1978/79.

23. The medical services at Ponce are unacceptable. There is no record of sick call notes, no history or physical examinations. (Hastings, T. 2626). There are not even any records of physical examinations for inmates who have been hospitalized. (King, T. 670). There were no records for psychiatric inmates, even those in "calabozos". (Rundle, T. 222). In the hospital area inside the institution, there is a desperate need for disinfectants, soap and toilet paper. (Rundle, T. 344). The hospital area is a fire trap. (King, T. 670).

24. The "calabozos" are small; they have no windows, no beds, no wash basin, no showers and no drinking water. They are only about 3 feet wide and are 10 to 12 feet deep. Toilets have been placed in some of them during the hearing or slightly before the hearing commenced. Some of those toilets are not connected to the plumbing system. As many as three naked men have been placed in a single dungeon. Most of the people placed in "calabozos" in Ponce are mental cases and at least one man had been in "calabozo" for more than two years.

25. The "calabozos" are filthy and they stink. (Rundle, T. 216–217). One man was apparently in "calabozo" even though his criminal case had been dismissed in 1978. (Rundle, T. 219–220). There is no access to psychiatric services. (Hastings, T. 2627). On the day of Dr. Hastings' visit, there were 14 persons confined in six "calabozos"; two of which had no toilets. (Hastings, T. 2790). The "calabozos" in Ponce are extremely dark and depressing. (Hastings, T. 2792).

26. The hospital area in the prison has been patched with tin cans to prevent rats from coming through the floor. (Díaz–Royo, T. 1690). The medical records are not even dated and no medical record was found in Ponce that was complete. (King, T. 672).

27. The sanitation is horrible. The dormitories are overcrowded and gloomy; the bathrooms are dirty with no working toilets and showers. The kitchen floor and equipment is broken and unsatisfactory, which constitutes a public health hazard. It also contains an open sewer. (Rundle, T. 354). There are no recreation areas in Ponce that are adequate (Rundle, T. 224), and young adults that were found by Dr. Díaz–Royo to be filled with rage (Díaz–Royo, T. 1690), were no longer in the institution at the time of Dr. Hastings' visit. The overcrowding is so bad that there are insufficient beds, mattresses and sheets, and people have died for lack of medical attention. (Hastings, T. 2793).

28. The "rated capacity" for Guayama Regional Institution is 240 persons and from 349 to 388 were confined on various dates between April and June, 1980. Guayama is a new institution and has been in use for less than five years. The prisoners

from the North part are separated from the prisoners from the South part of Puerto Rico for security reasons.

29. There are no psychiatric services available at the prison and "calabozos" at Guayama, which are similar to those used at Bayamón, are for mental cases and for those seeking asylum. The solid steel doors on the "calabozos" had to be detrimental to the psychotics and non–psychotics housed therein. (Rundle, T. 230).

30. To get on sick call, a prisoner needs the approval of his penal guard, and it is conceded that some sick people get no medical attention. There is a contract physician who is supposed to come to the institution ten hours a week. The sick call schedule, however, varies. There was no dentist at Guayama at the time of the hearing, but there is equipment available.

31. The psychotics, most of whom were in "calabozos", were receiving no psychiatric attention, no medications and no medical treatment of any kind; nor were health records kept. (Hastings, T. 2803).

32. The sanitation, for a new institution, is bad. The bathrooms are covered with water; they are dirty and smelly and the toilet facilities frequently break down. The plumbing fixtures are frequently not functioning. The noise level for the pre–trial detainees is intolerable. (King, T. 675). The films and photographs that the Court saw for Guayama are depressing when one considers that this institution is less than five years old.

33. The Humacao Regional Institution was constructed in 1914 in wood and it has been replaced by concrete throughout. The "rated capacity" is 150, but that number results from a Superior Court Order limiting the institution to no more than 150. It has had as many as 190, and on the days to which testimony is relevant herein, it has always exceeded the 150 number. At 150 inmates, including pre–trial detainees, the average space per inmate for the institution is 23 square feet, but for individual dormitories that number may be less. The plumbing and sanitation is bad; there is no hot water; some beds are broken and a large amount of food has had to be destroyed because of rats and other vermin.

34. The medical care at Humacao is provided by a contract physician who attends six hours, approximately three times a week and a nurse who works full time during the day. The physician only runs a sick call; no physical examinations are given; there is no preventive dental care; there is no psychiatric service provided; there is no one trained in emergency procedures. (Hastings, T. 2636). There is no organized system for handling medications, many of which are kept beyond their expiration date, and there is not even any record kept of medication administered. (Hastings, T. 2637). The medical records are poor (Hastings, T. 2636) and the food handlers do not have current certificates. (Hastings, T. 2639). The refrigeration does not work (King, T. 699) and no proper medical record keeping is maintained. (Hastings, T. 2641; King, T. 699). The inmates frequently have to purchase their own medications. (King, T. 700).

35. The "calabozos" are constructed as are the "calabozos" in Arecibo; that is, like cages with bars on tops. They have no beds, nor are all of the inmates in them given mattresses. The "calabozos" are hardly ever used for disciplinary matters and they are only used for psychiatric cases or for isolation of sick people and/or protective custody. There have been two suicides in "calabozo"; one during the pendency of these proceedings. The mental case that is presently in "calabozo" has never been examined by a psychiatrist and the only person who has written in his medical record is the nurse.

36. There is no provision in this institution for special diets. (Hastings, T. 2819).

37. The institution cannot physically function with so many people. The kitchen floor is cracked, hot water does not exist even for dishes; toilets do not work; there is exposed wiring in the dormitories; there is no fire extinguisher; (King, T. 702); and there is poor ventilation. (Hastings, T. 2639).

**24**

38. A cholostomy patient was kept there without having been seen by a doctor and without having replacements of his cholostomy bags. Were it not for the visits of plaintiffs' experts, his health would seriously be impaired. (King, T. 700). The recent suicide was a pretrial detainee sent to "calabozo" because he was to be isolated because of venereal disease. (Hastings, T. 2817–2819).

39. Like Aguadilla and almost every other institution, there are insufficient penal guards. The ration of penal guards to inmate may be as low as 1:18 or 1:20 per shift. This makes it difficult to properly protect the prisoners. There have been 13 attacks, including one stabbing death at Humacao since July 1979. The lack of guards also makes it difficult if not impossible for inmates who have medical treatment pending outside the institution to keep their appointments. (Hastings, T. 2816).

40. Miramar Home for Young Adults is in such a run down condition that the defendants' expert testified that "I would demolish it if I could". (Hastings, T. 2775). Its "rated capacity" is 200 persons, but the population varied, according to the witnesses, from 267 to 278. Although meant to house young adults only, there were adults there. (King, T. 661).

41. There are no maximum security prisoners at Miramar. The "calabozos", which were in a completely isolated area of the building and which may be dangerous for confinement of healthy people and should never be used for persons who have been confined there in the past such as young diabetics, (King, T. 664), were closed. According to the superintendent, he has no intention of reopening them even though two of them are presently under repairs.

42. The rest of the institution is run down. The sanitation conditions in the kitchen and throughout, are bad, but the cleaning procedures are themselves unsanitary. The kitchen is unclean and uncleanable. (Hastings, T. 2616). The floor is cracked, rodents and vermin come through it and the garbage storage is inadequate and uncovered, creating an invitation to

flies and the windows are without screens. (Hastings, T. 2617). In the dormitories, the overcrowding is bad, but made worse by the inmate distribution. (Díaz–Royo, T. 1684). In some dormitories the urinals empty into the showers and the lack of cleanliness is so omnipresent that cockroaches are in the medicine chest. (King, T. 661).

43. At Miramar, a contract physician comes to manage a sick call five times a week. The admission to the sick call is via the permission of the prison guards. Most records show no physical examinations; there are no psychological or psychiatric screening procedures and the record keeping is poor and the records are incomplete. Many of the drugs have expired, and the logbook containing the names of the persons who are to receive medications does not match the labels on the bottles or medications of the persons for whom they are intended. (Hastings, T. 2619). The dental equipment appears not to have been used for a long period of time, and such little emergency equipment that is present, like oxygen, cannot be used because there is no wrench to open the cartridges. (King, T. 662). The records of those persons who were thought to be mentally ill were either non–existent or so sketchy as to be inadequate for any reasonable purpose in terms of an evaluation establishing the diagnosis or any reasonable plan of treatment. (Rundle, T. 207–208).

44. As everywhere throughout the entire system, there is inadequate space for storage of personal possessions such as clothing and towels. (Rundle, T. 211). Miramar, as it exists and as it is operated, has an adverse effect on any one forced to live in such a degree of overcrowding with inadequate sanitary facilities. (Rundle, T. 213). The rage of the inmates against the system is more evident than elsewhere. (Díaz–Royo, T. 1685).

45. The Vega Alta Industrial School for Women is a euphemistic title. It is a prison. The physical plant is run down with exposed wiring, broken plumbing and a large gaping hole in the dining room. The budget for food preparation is $1.15 per

person and that figure within 50 cents, is reflective of the budget for food per inmate in each institution. Inmates have to go through the same procedures to see a doctor as they do in the male institutions. Medications are not provided and even patients who demonstrate their need for certain medication may have them withheld. The institution itself does not have sufficient medications and has to go out to the community to seek donations.

46. The medical services are provided by a general practitioner and a psychiatrist, each of whom comes to the institution about four hours a week. The schedule of the general practioner, however, is set by the doctor himself, and no one knows in advance when he is coming. (King, T. 679). The psychiatrist visits the institution on Saturdays (Rundle, T. 244). The medical charts are not up to date, but most of the patients here have had a physical examination (King, T. 680). No record is kept of the administration of medications. The records for the psychiatric patients were deficient and none contained the elements which are generally accepted as necessary to justify the treatment program. (Rundle, T. 245). Less crowded than all other closed institutions, Vega Alta is, nevertheless, similar to all others in the general deterioration, lack of sanitary facilities, inadequate mental and physical examination and treatment.

47. The Bayamón Regional Institution, opened only four years ago as the then panacea for the prisoners who were housed

in "La Princesa", which Judge Torruella ordered closed,[10] is the crowning disgrace of the entire penal system in Puerto Rico.[11]

48. Bayamón was built primarily for pretrial detainees. It has a "rated capacity" of 640 inmates. The population figures range from 1,256 on the day of Dr. Rundle's visit, to more than 1,400 on the day the superintendent testified–May 29, 1980. There has never been less than 1,000 persons for at least two years. There are insufficient guards and the physical plant, the structure, the overcrowding and the lack of socio–penal services and the lack of medical services, including psychiatric services, presents major problems to the Administration.

49. The kitchen facilities are bad. There are open sewers and slow drainage. There are flies throughout the kitchen area; there were rat droppings and cat droppings; no hot water or soap for the kitchen workers; no caps or hair nets; multiple leaking pipes; no screens. (King, T. 690). The kitchen, in the opinion of the defendants' expert, presents a major public health problem. (Hastings, T. 2600).

50. The food appears unpalatable and there is evidence that the Administrator had to instruct the superintendent to give sufficient food. (Cruz de Batista, T. 2036). There is contradictory testimony concerning the availability of special diets. The superintendent testified that Bayamón could provide special diets and the defendants' expert testified that the institution was incap-

10. *Martínez Rodríguez v. Jiménez*, 409 F.Supp. 582, 587–588, 592, (D.P.R., 1976).

11. The Court was appalled viewing the motion picture and the still photographs. It must be much worse to visit it. The impressions of the witnesses convey, better than can the Court, the effect that Bayamón has upon the visitor. Dr. Rundle, in answer to a question posed by the Court, said at pages 413–414:

"(E)very time that I have been in a prison whether it was at Soledad when I went there to work for five years, in New York, or just on a visit, I come out depressed to some degree. And I have certainly been in situations which were very bad and were certainly very depressing. But I think the point I was making was that the concentration of the

horrors was greater there by a mode and much greater subjective affect upon me and I think also upon some of the others who were with me.

"Doctor King, for example, he and I talked about that and there came a certain point we just felt we had to get out of there. We could not deal with it any more."

The Administrator of Correction, in response to the following question: "You have been in office three years and in those three years would you see that the people in Bayamón have been living in sub–human conditions?" answered: "Yes, but that did not begin three years ago." (Cruz de Batista, T. 1879–1881). See footnote 1, *supra*.

able of providing them. (Hastings, T. 2764). The Court finds that Bayamón does not provide special diets when prescribed by physicians.[12]

51. The amount of food destroyed at Bayamón reaches astronomical proportions. Literally, tons of food have had to be destroyed because of contamination from rats, vermin, worms and spoilage. The Court finds that much of its spoilage stems from the lack of adequate sanitary conditions, poor storage and the lack of proper cleaning techniques.[13] The Court further finds that the conditions in the kitchen are detrimental to the public health of the entire institution and that food poisoning, salmonella, shigellosis, staphylococcal infections and hepatitis are inevitable. (King, T. 696). The food supplied at Bayamón does not include fresh fruits or fresh vegetables, although attempts are made to supply the recommended daily requirements of protein, carbohydrates, fats, vitamins and nutrients. At $1.40 a day or even at $1.75 a day, it is not possible for the Administration to supply a balanced diet.

52. The plumbing throughout the entire institution is a source of public health hazard. The sanitation was found to be inadequate by every person who testified, including the superintendent. According to the defendants' experts, the sewer system was improperly built and there is a structural defect which prevents drainage. The Administration has a civil engineer, but has no sanitation engineer. The chronic overpopulation of Bayamón also causes the plumbing system to become fatigued. (Rivera, T. 1608). The condition in Bayamón is violating the environmental quality law. (Rivera, T. 1610). The toilets do not work; the urinals flush into the sinks; the floors and walls are ruined by seeping water; there has been internal flooding.

53. The plumbing system at Bayamón does not connect with any city sewage system, but empties into open manholes. The manholes overflow. In the opinion of the Administration's engineer, the general plumbing and sanitation situation at Bayamón represents an emergency. (Rivera, T. 1627). The plumbing system at Bayamón is in a state of collapse. (Rivera, T. 1641). There is insufficient supervision and maintenance.

54. The intake section at Bayamón is designated as "Q" which stands for quaranteened area. Here, pretrial detainees are kept. Although built to accommodate 68 persons, as many as 300 or more have been confined in "Q". Because the inmates in "Q" are pretrial detainees, they are not allowed to leave the area for any recreation or exercise. The majority sleep on the floor and many do not even have mattresses. It has always been overcrowded.

55. Most of the toilets in "Q" do not work; the urinals are overflowing; there are few showers and there is water on the floor and the smell of urine and excrement is omnipresent. In the individual cells, (and there is a group on each of the two floors of the "Q" section), young adults are held while awaiting trial. The young adults are placed into these individual cells to protect them from rape. There were, on the day of Dr. Hastings' visit, three young adults in each cell. (Hastings, T. 2586). The overcrowding in "Q" is so severe that it is a public health problem. (Hastings, T. 2735). The excuse for this inhuman treatment of persons who are presumed innocent is just that there is no other place to put them. (Cruz de Batista, T. 2054). The Administration claims that although this situation has existed since Bayamón was opened, that the situation is temporary. (Cruz de Batista, T. 2057). Despite the fact that everyone regards the overcrowding in "Q" in Bayamón

12. The Court finds that the superintendent of Bayamón was not a credible witness. The Court admonished this witness because he was evasive (T. 526). Whenever conflicting evidence as to actual conditions appeared in the record, the Court finds that the testimony of the trained expert observers is in every instance more credible than those of the employees of the institutions.

13. "I never visited a kitchen (before) where there was no soap for the institution." (King, T. 690).

to be so severe as to present an emergency situation, no short-term plan has been made nor has any plan been presented to the Governor. (Cruz de Batista, T. 2072).

56. The dormitories, living quarters or modules at Bayamón are all overcrowded. The plumbing is bad in each module and the institution does not supply any articles of personal hygiene. No soap, towels, toothpaste, toothbrush, or underwear are supplied. Toilet paper is supplied, but in such grudging amounts that it may contribute to the disintegration of the plumbing system as inmates seek every means to keep clean. The lack of toilet and other items of personal hygiene is degrading and humiliating.

57. The individual dormitory units are also fire hazards. If there ever had been fire extinguishers and fire hoses, they are missing or destroyed and have never been replaced. There exists no evacuation plan, no disaster plan, nor any medical mobilization plan in the living areas. Because there are so many inmates at Bayamón, recreation and exercise is restricted. The inmates eat in shifts by module and are allowed exercise periods once or twice a week.

58. In Bayamón, there are 140 cells for maximum security. Almost all are occupied by persons who claim that they have enemies in the general population. The majority are occupied by only one inmate. Many toilets in many of the maximum cells do not flush. The inmates who are admitted to maximum, lose their custodial classification and are deprived of their privileges. They do not exercise outside of their cells and they eat in their cells.

59. The "calabozos" at Bayamón, as in Guayama, face a central corridor and have a solid steel door with two slits. The upper slit is so that the confinee can look out and the prison guard can look in; the bottom slit is for passage of a food tray. Except for bathing at the sufferance of the penal guard, the person confined to "calabozo" is not permitted out for any reason. There are 12 "calabozos" and generally more than one person is placed in a single cell. As many as three have been placed in single cells. Seldom are persons placed in "calabozo" for disciplinary reasons. People are placed in "calabozo" for the same reason that they may be placed in maximum—they are either requesting asylum or they have been labeled psychotic by a prison guard. The passageway between the "calabozo" is frequently covered with raw sewage because of a broken sewer line in that area. The solid steel door interferes with sensory perception.

60. In the context of the physical setting of the "calabozos", the defendants' expert could find no medical or psychological or practical justification for the existence or use of solid doors in front of the "calabozos". (Hastings, T. 2742–2743). The mental cases that are in "calabozos" have had no psychiatric evaluation; in fact, there is no medical record for those that were there in April or May. No one seemed to have any knowledge as to the length of time persons were kept in "calabozos" at Bayamón. But prisoners who were in "calabozo" there have testified that they have been there for months. No one is given a hearing when placed in "calabozo" despite the fact that it is the Correction Administrator's interpretation of the regulation that everyone placed in a "calabozo" should have a hearing before being put there, or at least seven days after, if they were placed there as an emergency. (Cruz de Batista, T. 1902). The effect of being placed in "calabozo" is destructive to the personality.[14]

---

14. Dr. Díaz-Royo testified, at 1717:
"Aside from the despair and despondency, we cannot establish, but we can say that if the person had some mental disturbance prior to "calabozo", with some certainty I can say he will not get better. He will deteriorate, if he was angry he will get angrier. If he was [non] cognative or [had] defective organization, it will be worse at that level if you have something prior to that. Now if

you were a healthy human being and you were put in calabozo your memory is going to be impaired somehow, your problem solving abilities are going to deteriorate as has been demonstrated in experimental work ..."
The effect could be permanent. He testified at 1718:
"If you have what has been called the premorbid personality—and premorbity doesn't

The risk of depriving fragile personalities of sensory perception is great. (Hastings, T. 2744).

61. No doctor visits the "calabozo". The Court has heard testimony as to persons who have recently died in "calabozo" for lack of medical attention, and the Court finds that on the basis of all the testimony, that there is no justification, medically or psychiatrically, or for any other reason, for the continued existence of the "calabozos".

62. Bayamón Regional Institution serves as the referral point for medical observation and treatment of the entire system. It has a roster of two part–time general practitioners who, combined, work less than 20 hours per week,[15] several specialists, such as ophthalmologist, dermatologist, orthopedist, dental hygienist, radiologist, who are supposed to come for several hours a week, and a psychiatrist, who is supposed to come about ten hours a week. Although the Administrator of Correction stated that she knew that the proper standard was that they should at least have one full–time doctor for every 500 prisoners, there is no full–time doctor in the system. (Cruz de Batista, T. 1883). There is no current regulation concerning medical or psychiatric treatment, but there is a recognition that the American Medical Association's health standards for prisons should be adopted. (Cruz de Batista, T. 1897). There is also a recognition that the system needs at least ten full–time psychologists or psychiatrists. (Cruz de Batista, T. 1903). There is no policy to give physical examinations to pretrial detainees as a matter of course, and in fact, they are not given. Histories are not taken of persons admitted into the system either as pretrial detainees or as convicted persons, nor is there any psychiatric screening of new inmates. There is no internist; there is no official policy and procedures manual; there is no ambulance; there is no stretcher. There is a pharmacy manned by a registered pharmacist, but that does not alleviate the necessity for the inmates having to purchase special prescriptions with their own funds.

63. The physicians on call did not appear for the scheduled sick calls and sick calls are erratic, both as to the time they are held and the duration, and on occasion, the non–qualified Corporal of the guard conducts the sick calls.

64. There have been outbreaks of epidemics of mange, tuberculosis and dengue.[16] No reports or investigations are made of the source of the infectious diseases. The medical records are generally non–existent. Where they do exist, they are by any standards, inadequate. Histories are not taken; physical examinations are not performed; laboratory tests, if made, are not recorded; X–rays, if taken, are not recorded; sick call visits are frequently not recorded.

65. As a referral system for the medical problem cases arising in other institutions, Bayamón is a failure. There are no copies of the consultations made at Bayamón for such prisoners, nor are there duplicate files for such prisoners. Bayamón is not equipped to perform any kind of X–rays, other than chest films. It has no laboratory nor any electrocardiographic machine. The medical area does not come close to fulfilling the needs of those confined in Bayamón, much less referrals from other institutions. (King, T. 692). People are becoming ill and people are dying for lack of medical treat-

---

mean you are crazy, it means that you are vulnerable as all healthy humans, human beings are vulnerable if put under undue stress. "If you have certain premorbid traits which the calabozo situation particularly hits your structure, personality structure, you might permanently be impaired."

15. No expert who visited the institution ever met either of these general practitioners, no matter what day of the week or what time the inspection was made. When they were called by both Dr. King and Dr. Hastings for an interview, they could not be reached or would they come.

16. There is also a high incidence of venereal disease, but venereal disease is checked semi–annually through an agency of the federal government and most of the victims are identified and treated. Although venereal disease is prevalent, the most virulent are under control from the standpoint of public health.

ment. There is no way of knowing whether an epidemic is in progress.[17]

66. The total number of psychiatrically ill prisoners is unknown. The estimates run up to 50% or more of the population. Those medical records concerning psychiatric care that do exist are unacceptable by any standard. (Rundle, T. 397). The psychiatric staff does not exist and there is little, if any, contact between the socio–penal worker and the psychiatrist. There is no excuse for not performing acceptable psychiatric evaluations or not having acceptable medical and psychiatric records, nor not having a sufficient staff to provide the necessary treatment.[18] (Rundle, T. 315). There are probably 200 severely ill psychotics in the prison system who require medical care in a psychiatric hospital and many other hundreds who need intensive psychiatric care within the institution. There has never been any adequate psychiatric screening, and special treatment or isolation is given only to those who are completely disorganized and who are decompensating, or are in a state of cognitive deterioration. This evaluation of the severely mentally ill is now being made in a large part by penal guards who have no specialized training and only rely on their "experience".

67. At Bayamón, the psychotics who are not in "calabozo" are kept in that portion of the maximum security block known as Lower Maximum 1, but which is commonly referred to as "Máxima de Locos".[19] Anywhere from 14 to 18 persons are kept in this area among whom are several "John Does",

persons for whom the Administration does not have even a name. The psychiatrist has not been to this area for more than one year and none of the persons confined here have seen a doctor for that period of time. (Hastings, T. 2754). Of the 18 persons who were there on the day of Dr. Rundle's visit, there were medical records for only four. (Rundle, T. 248). The records revealed very little and there was not enough information to determine from the records whether the medication that had been prescribed was appropriate. (Rundle, T. 254–255). Although it has been alleged that some of the persons were placed in this area because they were suicidal, there was no way to know from the record that that is so. If it is so, they are getting the worst possible treatment. (Rundle, T. 266). If someone is dangerously suicidal, he belongs in a psychiatric hospital. (Rundle, T. 266; Hastings, T. 2667). The inmates in "Máxima de Locos" are kept in cells naked, without beds, without mattresses, without any private possessions, and most of them without toilets that work and without drinking water. They are being cared for by an inmate who washes them daily. There is feces all around their cells and the stench is overpowering. Only two of the 18 are receiving any medication. Each of the prisoners now confined in "Máxima de Locos" belong in a psychiatric hospital. (Hastings, T. 2595, 2666; Rundle, T. 279).

68. There are 48 other serious mental cases in the psychiatric module, D–1–C

---

17. It is depressing to relate the testimony and the impressions of the experts.

"Relative to the number of people that are confined, I have not seen any system in which there was such an absolute lack of qualified staff available and I have not seen any system in which there was such an absolute lack of thoughtful direction or leadership or procedures. There was a complete absence of any kind of systemic planning and the kind of care that emerges as a result of lack of resources and the conditions, I would characterize as systemic malpractice, both medically and administratively." (King, T. 703).
"There is almost no reasonable medical care provided." (Rundle, T. 286).

18. The Court agrees with the following statement:

"A prison system takes command of a man totally and therefore, must accept the responsibility for providing for certain basic necessities, one of which is medical care and that includes psychiatric care. As far as I am concerned, when a man goes into a prison system, he must receive a medical examination, which should include a screening psychiatric examination by some one who is specially trained." (Rundle, T. 321).

19. Translation is Maximum Security for the crazy.

Lower.[20] The persons in the psychiatric module do not receive regular medical attention. One of the men that was there when the module was visited by Dr. Rundle, was in a catatonic stupor and his life may have been saved by the intervention of Drs. Rundle and King. (Rundle, T. 262–263; King, T. 768). These inmates are totally neglected, and what attention they get and what records and medications are distributed, come through the efforts of one of their members who writes in the records as if he were a doctor. The persons in D–1–C Lower are unsupervised and are all in a state of cognitive disintegration.

69. There is also a hospital at the Bayamón Regional Institution with 25 beds; 12 of the beds are for the use of the Anti–Addiction Services, who have contracted the services of a doctor and a nurse. That doctor and nurse do not provide even emergency care for anyone who is not their patient. There is no on–site laboratory for the hospital patients. The hospital contains a large gaping hole in the ceiling. The hospital has never received approval from the Secretary of Health, and many of the patients who are there probably do not need intensive hospital care. (Hastings, T. 2590). In the hospital charts, there is no laboratory data, nor are there records of complete physical examination, nor are there histories. (Hastings, T. 2590). The paraplegics who are there in the hospital, occupy four beds and receive no medical treatment. Because they are hospitalized, these paraplegics are precluded from work, study or contact with others. (Hastings, T. 2747). The hospital is not administered by a professional staff, but it is run by the Corporal of the guard together with a night para–medic and prisoners who have some nursing background. Admission to the hospital and hospital care does not seem to relate to known medical standards. The hospital and examining area has no hot water in the doctor's bathroom. (King, T. 686).[21]

70. There is a position in the Central Office of the Administration of Correction called Coordinator of Medical Services. The duties of the Coordinator of Medical Services is to get the individual contract physicians to comply with their contracts; to buy medicines; to make changes in the budget and to coordinate the medical facilities from institution to institution and between the institutions and the community health services. There is no memorandum of standards or guidelines concerning the maintenance of medical records, the maintenance of psychological and psychiatric records, the keeping and recording of doctors' orders and prescriptions, the control of drugs or any other aspect of medical care at the institutions operated by the Administration of Correction. (Díaz–Delgado, T. 809). There are standard forms for medical histories to be filled out by the patient, standard forms for dental examination and other standard forms relating to physical examinations and prescriptions, but there is no standard utilization of these forms. (Díaz–Delgado, T. 811). There is no program to have inmates examined by a psychiatrist before being sent to the psychiatric wards. (Díaz–Delgado, T. 819). There is no memorandum concerning admissions to either "Máxima de Locos" or to the psychiatric module. (Díaz–Delgado, T. 820). There is no program or any regulations concerning intake physicals for all pretrial detainees, nor for intake physicals at any penal institution. (Díaz–Delgado, T. 820). The dermatologist and cardiologist resigned on May 8, 1980, and had not been replaced by the Medical Coordinator. The Medical Coordinator has never repaired the broken ceiling in the Hospital at Bayamón.

71. There is no program for the detection of viral diseases, dermatological diseases, infectious or venereal diseases and

---

**20.** The defendants' expert was never advised about these people. He was under the impression that there were only 40 identified severely psychiatrically ill in the entire penal system. (Hastings, T. 2753).

**21.** There is no place within the hospital area to isolate any inmate with infectious or contagious disease. (Peterson, T. 727). Release from the hospital may be by a penal guard authority as well as by a doctor. (Peterson, T. 727).

respiratory diseases in any of the institutions operated by the Administration of Correction. (Díaz–Delgado, T. 830). There is no program for X–rays, for dental inspection, for the detection of epileptics or other neurological disorders. (Díaz–Delgado, T. 831–832). There is no coordination to see that special diets issued upon the orders of a physician are in fact provided. (Díaz–Delgado, T. 833). There have been outbreaks of small epidemics of scabies, of mange and flu at every institution.

72. On the basis of all the evidence, the Court finds that the differences that exist between institution and institution, albeit, dramatic in some instances, is much less pronounced than the similarities. The system is run from a central office, with engineers, financial officers, penal program officers, medical coordinators, dietitians, socio–penal supervisors, records supervisors and budget controllers. Transfers of prisoners may be dictated by the central office, as well as its transfer of personnel. Policy, or the absence of policy, ultimately lies with the Administrator and the executive branch of the Commonwealth Government.

73. Thus, despite the insistence by the defendants and the concurrence by the Court that evidence be presented concerning each of the major institutions, the Court finds that the system is a unitary system and the relief that may be given must be on a system–wide basis.[22]

74. Unsanitary conditions dangerous to the health and life of the inmates exist throughout the system. This includes raw sewage in the kitchens and living spaces, the plumbing breakdowns, the toilets that do not work, the inoperative sinks and showers, the plethora of flies, insects, vermin and rats. The stench of excrement and urine commonly associated with zoos is predominant throughout the system.

75. The physical impositions upon inmates are dangerous to the health and safety of the inmates throughout the system. Lack of beds, doubling upon mattresses, or lack of mattresses, doubling and tripling in individual cells, failure to give sufficient minimal living space, lack of adequate ventilation and the failure to give any articles of personal hygiene or to afford any privacy, is systemic.

76. The "calabozos" are ubiquitously used principally for improperly identified mental cases and for persons who seek asylum from threats of bodily harm. These cells are seldom used for disciplinary purposes, and even then, under conditions that are cruel and unusual. They are all in isolated areas of the respective institutions, all insufficiently attended, insufficiently lighted, most of them without the basic amenities of beds, mattresses, sheets, functioning toilets or drinking water, and all confinees in them are without any exercise, recreation or rehabilitative program.

77. The health care throughout the system leaves much to be desired. There is no program or plan or direction. Intake physical examinations are notable by their absence. There is no systematic record keeping. Records, when they do exist, may not include physical examinations, histories, laboratory tests, X–rays, sick call or progress notes, medication orders or diagnosis. Records for so–called psychiatric patients do not exist, or are sketchy and inadequate by any standard. Medical assistance depends upon persuading a chain of penal

---

22. By the third day of the hearing, the evidence was mounting that the commonality of the faults was much greater than the difference. During a colloquy, the Court stated: (T. 360–361)

"(I)f the system is a unitary system as it apparently is where the central administration is carried out by the director here in San Juan and it applies to all the institutions through the superintendent, assistants, wardens and whatever, I am not going to enter an order specifically for each institution. If I do

enter an order, it will be addressed to the Administrator of Correction and that the Administrator would be the one in charge or the overseer to see that the Court orders are carried out. . . .

". . .

"And if there is one institution for example, let's talk about the calabozos. There is an order issued about closing calabozos and there is only one institution that uses them, that's better for the Administrator. She only has to close one instead of seventeen. . . ."

guards that the inmate is sick enough to merit examination by a physician or nurse. Inmates die from lack of medical treatment with frightening regularity. Psychotics who should be hospitalized in psychiatric hospitals are kept caged like wild animals with no psychiatric or medical intervention. Others less disorganized are allowed to deteriorate. Medications are not properly dispensed, accounted for, or sometimes not even given without payment by the inmate. Special diets are almost non–existent, even when ordered by the prison physician. Medications necessary for health are not given on any regular basis. X–rays, laboratory tests, preventive medical and dental care are almost unknown. Epidemics of mange, scabies, respiratory and other infections occur.[23] Outside medical care depends at times upon the sufferance of the penal guards or upon a sufficiently large daily roster of guards so that enough are available to transport the inmates. Medical, psychiatric, psychological, nursing or paramedic staff is woefully small to cope with the number of inmates or the disease–infested environment. Deficiencies in health care and hygiene foster inmate frustration and resentment.

78. Death haunts the prisons. Suicides and stabbings occur from lack of supervision, and the overcrowded conditions where young adults mix with long–term prisoners, where pretrial detainees live in incredible concentration camp–like units along with convicted felons, and where neglect may be so great as to be equated with brutality.[24] The excessive overcrowding, or acute population concentration, rampant in the system, makes adequate supervision of inmates very difficult in all institutions. The extremely high inmate–to–staff ratio negates personal interaction between the two, as the guards must spend most of their time protecting themselves. This specific condition more so than any other nurtures the highly volatile atmosphere which permeates all institutions.[25]

79. The conditions heretofore enumerated are barbaric and shocking. If not stopped, more persons will needlessly die before their time, or will become severely ill. Constitutional violations do exist, and there is no adequate remedy at law.

80. Deference to the Commonwealth authorities to institute long–term solutions, or to defer action until the State Penitentiary reopens, or to wait 120 days for the inauguration of new medical solutions, is unwarranted. The indescribable conditions of confinement in the isolation cells, dungeons ("calabozos") and maximum security cells of the various institutions, as depicted in the photographs admitted into evidence and visually portrayed in the movies shown to the Court, demand from this Court immediate and corrective action.[26]

**23.** In the Regional Institution of Bayamón alone, at a given time, approximately 200 inmates out of a population of 1265 were suffering from mange, or roughly 17%. During the same period of time anywhere from 200 to 300 inmates failed the tuberculosis tests, or roughly between 17% and 24%. (Maldonado–Vázquez, T. 528, 532).

**24.** Although the Court heard evidence concerning "calabozo" deaths which involved alleged beatings by prison officials, no findings of physical brutality are made. The proof is insufficient and brutality was not an issue framed by the show cause order. Suggestions of brutality appear interspersed throughout the record, especially in the testimony of the prisoners.

**25.** Contrary to defendants' expert's testimony to the effect that the level of tension at Bayamón Regional Institution was quite low (Dr. Hasting, T. 2587, 2754), the plaintiffs' experts perceived in their visits a high level of tension. (Rundle, T. 286, 331, 381; King, T. 688–689, 705, 781; Fogel, T. 1259–1261, 1263–1264, 1307–1308; Díaz–Royo, T. 1687-1688). Subsequent events to the completion of the hearing proved Dr. Hastings wrong. The first page of the "San Juan Star", on June 28, 1980, carried the following banner headline: "Three Inmates Killed. One Injured in Bayamón Prison Brawl".

**26.** The Court's intervention is further sustainable by the inaction of the Governor's Special Commission of Inquiry (Plaintiffs' Exhibit 110). This commission was created with the specific duty to investigate the recent rash of escapes occurring in the jails of Puerto Rico. In the course of its fact–finding inspections of the various institutions one or more members of the Commission, composed by the Secretary of Justice, two former Secretaries of Justice, the Police Superintendent, and the Administrator,

81. An emergency exists and irreparable harm will occur if immediate relief is not granted.[27]

### Conclusions of Law

1. The Eighth Amendment provides: "Excessive bail shall not be required, nor excessive fines imposed, nor cruel or unusual punishment inflicted." The Eighth Amendment is applicable to the states through the Fourteenth Amendment. *Furman v. Georgia*, 408 U.S. 238, 92 S.Ct. 2726, 33 L.Ed.2d 346 (1972).

2. Puerto Rico occupies a unique position with relation to the United States and the Supreme Court has never resolved whether the inhabitants of Puerto Rico are protected by the Bill of Rights or by the provisions of the Fourteenth Amendment. *Calero–Toledo v. Pearson Yacht Leasing Co.*, 416 U.S. 663, 94 S.Ct. 2080, 40 L.Ed.2d 452 (1974). Nevertheless, the Supreme Court has categorically stated that regardless of whether the rights of its inhabitants are afforded protection under the Eighth or Fourteenth Amendments, such protection is available through suits filed pursuant to 42 U.S.C., Section 1983, and jurisdiction lies under 28 U.S.C., Section 1343. *Examining Board of Engineers, Architects and Surveyors v. Flores de Otero*, 426 U.S. 572, 96 S.Ct. 2264, 49 L.Ed.2d 65 (1976).

■ 3. Pretrial detainees, however, are not prisoners and their restraint is justifiable under either the Fifth Amendment or the Fourteenth Amendment, provided that their restraint is not punished or the conditions and restrictions imposed upon them do not otherwise violate the Constitution. *Bell v. Wolfish*, 441 U.S. 520, 99 S.Ct. 1861, 60 L.Ed.2d 447 (1979).

■ 4. Absent an intent to punish, if the restriction or condition of pretrial detention is arbitrary or purposeless in relation to the maintenance of the effective management of the detention facility and to insure the detainee's presence at trial, then a court may infer that the purpose of the governmental action is punishment that may not constitutionally be inflicted upon detainees *qua detainees. Bell v. Wolfish, supra*, 441 U.S. at 538, 99 S.Ct. at 1874.

■ 5. The overcrowding, lack of sanitation, the absence of health facilities or adequate medical or psychological services, the triple bunking of young adults, the failure to protect the pretrial detainees from attack, constitute punishment, whether intended or not.

■ 6. The Eighth Amendment proscribes more than physically barbarous punishment. *Gregg v. Georgia*, 428 U.S. 153, 96 S.Ct. 2909, 49 L.Ed.2d 859 (1976) (Joint Opinion of Stewart, Powell and Stevens, JJ.). Punishments which are incompatible with "the evolving standards of decency that mark the progress of a maturing society" are repugnant to the Eighth Amendment. *Trop v. Dulles*, 356 U.S. 86, 78 S.Ct. 590, 2 L.Ed.2d 630 (1958).

7. Embodied within the Eighth Amendment are "broad and idealistic concepts of dignity, civilized standards, humanity and decency . . .", *Jackson v. Bishop*, 404 F.2d 571, 579 (8 Cir., 1968) and prohibitions of treatment which "involve the unnecessary and wanton infliction of pain." *Gregg v. Georgia, supra*, 428 U.S. at 171–173, 96 S.Ct. 2925 at 2924–25 as quoted in *Estelle v. Gamble*, 429 U.S. 97, 102–103, 97 S.Ct. 285, 290, 50 L.Ed.2d 251 (1976).

■ 8. The government's obligation to provide medical care, recognized in the legislation of Puerto Rico, if not properly met, may produce physical torture or lingering

---

became aware of the conditions of confinement affecting the plaintiffs and their repercussions in light of recent federal court's requirements that penal conditions must comply with civil rights. The report was delivered personally to the Governor by the Secretary, but the Commission, a continuing commission, never met after the report was submitted. (T. pp. 1935 thru 1980).

**27.** The defendants' experts position on direct examination was that all of these ills existed, but time should be granted for reorganization. However, he admitted on cross–examination that emergency conditions were everywhere and his own recommendations were that drastic measures be implemented immediately.

death in the worst cases and in less serious cases, may result in pain and suffering. Deliberate indifference to the serious medical needs of the inmates constitutes "unnecessary and wanton infliction of pain" proscribed by the Eighth and Fifth Amendments. *Estelle v. Gamble, supra,* at 104, 97 S.Ct. at 291.

■ 9. The medical program or better said, the lack of it, in the institutions operated by the Puerto Rico Administration of Correction violates the Constitution.[28]

10. If individually, any one of the following practices does not violate the Constitutional interdictions, the combination of them does. The failure to have a medical director; the failure to employ any full-time medical or psychiatric personnel; the failure to provide intake examinations of all pretrial and convicted persons; the failure to maintain proper medical records or standards; the failure to permit direct access from the prisoner to the medical authorities; the failure to provide articles of hygiene; the failure to screen the mentally ill, or if screened, the failure to afford meaningful treatment; the failure to hospitalize the seriously ill; the failure to provide medically ordered special diets; the failure to provide needed prescriptions; the failure to provide meaningful dental care; the isolation of the known psychotics without clothing, functioning sanitary facilities, treatment or medication; the failure to screen epileptics, diabetics, tubercular inmates or persons suffering from kidney or other diseases; the unsupervised isolation of inmates who have made suicidal threats; the close juxtaposition of ill and healthy; the failure to stop disease–producing unhygienic conditions, like open kitchen drains, raw sewage in dormitories and elsewhere; permitting the infestation of food and clothing by lice, scabies, rats and other vermin; and the failure to have any medical planning, emergency equipment and procedures and disaster plans.

■ 11. Solitary confinement is not *per se* unconstitutional. If the segregated confinement involves neither intolerable isolation, nor inadequate food, heat, sanitation, lighting or bedding, and if the confinement is short–termed, and properly supervised with no lack of necessary medical attention, it offends no Constitutional prohibition. *O'Brien v. Moriarity,* 489 F.2d 941 (1 Cir., 1974).

12. Isolation, for any reason, without adequate sanitary conditions, is unconstitutional. *Wright v. McMann,* 387 F.2d 519 (2 Cir., 1967); *Hancock v. Avery,* 301 F.Supp. 786 (M.D.Tenn., 1969); *Jordan v. Fitzharris,* 257 F.Supp. 674 (N.D.Cal., 1974); *Novak v. Beto,* 453 F.2d 661 (5 Cir., 1971).

13. Isolation, for prolonged periods of time without exercise and recreation, is unconstitutional. *Sinclair v. Henderson,* 331 F.Supp. 1123 (E.D.La., 1971); *Laaman v. Helgemoe,* 437 F.Supp. 269 (D.N.H., 1977).

14. Isolation which threatens the physical health of prisoners and which interferes with medical attention is unconstitutional.

---

28. Prior to the decision of the Supreme Court in *Estelle v. Gamble, supra,* courts had determined that prison officials and the medical officers employed or contracted by them, had wide discretion in treating prisoners and only a clear allegation and proof of abuse of discretion would elevate the claim to constitutional proportions. However, there were cases prior to *Estelle v. Gamble,* which held that failure or refusal to provide medical care, or treatment so cursory to be no treatment at all, are compatible with the "deliberate indifference to serious medical needs" test of *Estelle v. Gamble.* The evidence in this case supports the conclusion that the practice is unconstitutional. See *Tolbert v. Eyman,* 434 F.2d 625, 626 (9 Cir., 1970) (warden refused authorized medicine); *Page v. Sharpe,* 487 F.2d 567, 569 (1 Cir., 1973) (conduct in the giving or failing to supply treatment to prisoners which shocks the conscience is actionable under 1983); *Dewell v. Lawson,* 489 F.2d 877 (10 Cir., 1974) (failure to procure urgently needed attention may amount to cruel and unusual punishment); *Thomas v. Pate,* 493 F.2d 151 (7 Cir., 1974), cert. den., sub nom. *Thomas v. Cannon,* 419 U.S. 879, 95 S.Ct. 143, 42 L.Ed.2d 119 (1974) (medical care so clearly inadequate as to amount to refusal); *Newman v. State of Alabama,* 503 F.2d 1320, 1331 (5 Cir., 1974), cert. den. 421 U.S. 948, 95 S.Ct. 1680, 44 L.Ed.2d 102 (1975) (lack of available personnel; ill–conceived emergency and referral procedures, shortages in drug supplies, disorganized lines of therapeutic responsibility, glaring unhygienic conditions) (callous indifference, n. 14, 1330).

*Gates v. Collier*, 501 F.2d 1291 (5 Cir., 1974); *Ramos v. Lamm*, 485 F.Supp. 122 (D.Colo., 1979).

15. Solitary confinement of young adults is unconstitutional. *Morales v. Turman*, 364 F.Supp. 166 (E.D.Tex., 1973); *Inmates of Boys' Training School v. Affleck*, 346 F.Supp. 1354 (D.R.I., 1972).[29]

16. Solitary confinement of psychiatric patients without supervision, without treatment and without medication, is cruel and barbaric. *Laaman v. Helgemoe, supra.*

17. The use of the solitary confinement cells known as "calabozos" for housing persons voluntarily seeking protective custody, accompanied frequently as it is with multiple prisoners per cell, lack of any exercise, lack of working toilets, no drinking water, no ventilation, unbearable heat and insufficient light, with the accompanying loss of work privileges and change in classification, constitutes arbitrary and cruel punishment.

18. The "calabozos" in the Puerto Rico's prisons physically violate the Eighth Amendment proscriptions. They are isolated from the rest of the prisons, attended irregularly, they contain insufficient space, light and ventilation, are overpoweringly destructive, and some are invitations to suicide. "With or without improvements" their continued use "cannot be suffered in a society governed by our Constitution". *Laaman v. Helgemoe, supra*, at 323.

19. The punishment of persons because they are mentally disturbed is unconscionable and barbaric. Isolation without clothes or bedding in "calabozos" or in filthy stinking maximum security cells of mentally ill persons, not only violates all modern treatment practices, but also offends all notions of civilized behavior of humanity. *Estelle v. Gamble, supra; McCray v. Burrell*, 516 F.2d 357 (4 Cir., 1975).

20. The failure to hospitalize known mentally ill under conditions where the penal institution personnel know that they cannot provide medical or psychiatric services constitutes cruel and unusual punishment. *Bowring v. Godwin*, 551 F.2d 44 (4 Cir., 1977).

21. Overcrowding is not *per se* a violation of the Eighth Amendment's prohibition against cruel and unusual punishment. Nor is this Court bound by a standard of "rated capacity" set by the institution or any of the organizations who have published standards[30] for jails and prisons. According to *Chapman v. Rhodes*, 434 F.Supp. 1007, 1021 (S.D.Ohio, 1977), the American Correctional Institute has set 75 square feet, the National Sheriffs' Association Handbook on Jail Architecture calls for 70–80 square feet for single occupancy detention, and its Manual on Jail Administration sets 55 square feet as minimal for multiple celling. In 1969, the Army standard was 55 square feet and the National Council on Crime and Delinquency Model Act for the Protection of the Rights of Prisoners concluded that not less than 50 square feet of floor space in any confined living area should be provided. The court in *Chapman, supra*, held that double celling in 60–foot cells was federally unconstitutional.

---

**29.** Young adults are not juveniles, but Judge Pettine's observation is subscribed by this Court. He said in 346 F.Supp., at 1367:

"If a boy were confined indoors by his parents, given no education or exercise and allowed no visitors, and his medical needs were ignored, it is likely that the state would intervene and remove the child for his own protection. See R.I.G.L. 14–34. Certainly, then, the State acting in its parens patriae capacity, cannot treat the boy in the same manner and justify having deprived him of his liberty. Children are not chattels."

**30.** The plaintiffs' experts, although mentioning various standards, explicitly negated that their opinions were based upon the standards as some sort of talisman for space requirements. Dr. Hastings was likewise wary of putting stress upon the standards. The Administrator of Correction did state that she did refer to some standards and although she never applied for accreditation with the American Correctional Association, she is aware of their standards and plans to attend the ACA convention.

Other cases require space limits of 70 square feet or 75 square feet in dormitories that is the concern of this suit, *Battle v. Anderson*, 564 F.2d 388 (10 Cir., 1977); *Palmigiano v. Garrahy*, 443 F.Supp. 956 (D.R.I., 1977); *Anderson v. Redman*, 429 F.Supp. 1105 (D.Del., 1977), or as low as 50 square feet of space. *Gates v. Collier*, 501 F.2d 1291 (5 Cir., 1974). This Court has previously set the 70 square feet minimum as constitutional requirement in *Martínez Rodríguez v. Jiménez*, 409 F.Supp. 582 (D.P.R., 1976). In view of the most recent decisions, especially *Williams v. Edwards*, 547 F.2d 1206 (5 Cir., 1977); *Jordan v. Wolke*, 460 F.Supp. 1080, 1086–1089 (E.D. Wis., 1978); and *Bell v. Wolfish, supra*, this Court rejects any approach that will determine any fixed amount of minimum space as constitutional.

■ 22. The actual square footage in the dormitories of Puerto Rico prisons is closer to 20 square feet and does not approximate any suggested standard. In some areas, such as Aguadilla, Ponce, Miramar and the "A" Sections of Bayamón and Guayama, the space is almost non–existent. The dormitories in all these institutions are all lacking in space, sanitation, ventilation and are such firetraps that in some places the inmates are not confined during daylight hours, but allowed to move about within the confines of the institutions. Nevertheless, this mobility is not synonymous with recreation. It is the Court's conclusion that the space provided in the dormitories of the closed institutions, when considered together with the poor sanitary facilities and the insufficient light and ventilation and lack of privacy, are all unconstitutional.

23. There has been no suggestion that the individual cells at Río Piedras Maximum Unit, Bayamón or Guayama, are constitutionally improper for single cell occupancy. They are ample, provided that the toilets work and the inmates are provided beds, bedding and drinking water. This Court would permit, if it be required for short periods of time, double occupancy of these cells with the same provisions. The cells are too small for triple occupancy.

24. With the exception of the Vega Alta Industrial School for Women and the Maximum Security Unit at Río Piedras, every closed institution operated by the Administration of Correction is unconstitutionally overcrowded.

■ 25. The inmates who require special medications or special diets are being cruelly punished when such medication or special diet is withheld. *Pugh v. Locke*, 406 F.Supp. 318 (M.D.Ala., 1976); *Mitchell v. Untreiner*, 421 F.Supp. 886 (N.D.Fla., 1976); *Westlake v. Lucas*, 537 F.2d 857 (6 Cir., 1976); *Goldsby v. Carnes*, 429 F.Supp. 370 (W.D.Mo., 1977); *Laaman v. Helgemoe, supra*.

### Remedies

■ "Once a right and a violation have been shown, the scope of a district court's equitable powers to remedy past wrongs is broad, for breadth and flexibility are inherent in equitable remedies." *Smith v. Sullivan*, 553 F.2d 373, 381 (5 Cir., 1977), citing Chief Justice Burger in *Swann v. Charlotte–Mecklenburg Board of Education*, 402 U.S. 1, 91 S.Ct. 1267, 28 L.Ed.2d 554 (1971). Moreover, inadequate resources, which has been the main thrust of defendants' arguments, can never justify depriving any person of his constitutional rights. *Gates v. Collier*, 501 F.2d 1291, 1309 (5 Cir., 1974); *Shapiro v. Thompson*, 394 U.S. 618, 89 S.Ct. 1322, 22 L.Ed.2d 600 (1969).

Our Court of Appeals has suggested caution in ordering remedies without considering administrative convenience or expense. *Nadeau v. Helgemoe*, 561 F.2d 411, 417 (1 Cir., 1977). On the other hand, when faced with pervasive failure of responsible authorities to maintain the Essex County Jail in Massachusetts in conformity with constitutional requisites, it held that the district court did not abuse its discretion in ordering the jail closed if certain mandated corrections were not implemented. *Dimarzo v. Cohill*, 575 F.2d 15 (1 Cir., 1978). There, at pages 19–20, the Court said:

"Faced with unconstitutional conditions, the court ordered that the facility be brought within constitutional parameters. The remedy does not exceed the constitutional violation. See *Milliken v. Bradley*, 418 U.S. 717, 744–745, 94 S.Ct. 3112, 3126–3127, 41 L.Ed.2d 1069 (1974) (*Milliken* I). The mandated changes are modest in nature, fair to the inmates and not oppressive to the Correction authorities. We conclude that, on the facts of this case, the order of the district court is 'reasonable, feasible, and workable'. *Swann v. Board of Education, [Swann v. Charlotte–Mecklenburg Board of Education, supra] supra*, 402 U.S. at 31, 91 S.Ct. 1267, at 1283.

"We do not understand defendant Hall's complaint to lie with the specifically mandated changes, but rather with the trump card held by the district court, namely, the threat of ordering Essex closed if the changes are not made. We find neither error nor abuse of discretion in the court's action. A district court can order changes which will force the state to expend funds. *Milliken v. Bradley*, 433 U.S. 267, 288–291, 97 S.Ct. 2749, 2761–2762, 53 L.Ed.2d 745 (1977) (*Milliken* II); *Edelman v. Jordan*, 415 U.S. 651, 667–668, 94 S.Ct. 1347, 1357–1358, 39 L.Ed.2d 662 (1974); *Martínez Rodríguez v. Jiménez*, 537 F.2d 1 (1 Cir., 1976). If the legislature should balk at allocating funds for court ordered changes, an appropriate remedy for a court to choose, at least conflicting with the principles of federalism and the separation of powers, is to order the facility closed. See *Rhem v. Malcolm*, 507 F.2d 333, 399 ([2] Cir., 1974); *Inmates of the Suffolk County Jail v. Kearney*, 573 F.2d 98 (1 Cir., 1978)."

Balancing as we must, the rights of the inmates with the duties of the state officials to operate their facilities with that degree of discretion and within the confines of their budgetary allowances as provided by state law, we conclude that certain conditions can no longer be tolerated. The "calabozos" must go. There is no justification for using these cells for mentally ill or to isolate persons with communicable diseases. There is no justification for ever putting a pretrial detainee in such a chamber. While persons who seek asylum or protective custody may forfeit certain privileges, there is no constitutional justification for imposing added punishment upon such persons by confining them in this type of cell. Even if they were to be used for disciplinary purposes, only, these cells do not pass constitutional muster. They are so far removed from the rest of the institution or in such an isolated area that there is no hope of anyone placed in such a cell receiving adequate supervision, food, water, sanitation or medical facilities.

The psychotics must be removed from the penal institutions. Nothing we have seen is more depressing than the sight of young men totally out of contact with their surroundings and reality, stripped naked and left to their delusions and hallucinations without the benefit of working toilets, toilet paper, drinking water, beds, mattresses or linen, human attention, medical care or medications. The prisons cannot cope with these sick persons. All the identified psychotics or severe mentally ill must be removed forthwith and placed by the Commonwealth in proper psychiatric hospitals.[31]

Every incoming inmate, whether pretrial detainee or convicted prisoner must have a complete screening medical examination within one week from the date of his admission. To have such an examination presupposes the existence of proper systems or record keeping, regular annotations in the records and adequate personnel and staff to

31. The Court is aware, through testimony presented during the course of the hearings, that in many instances the superintendent of the institution sends identified psychotics or severe mentally ill inmates to the Forensic Ward of the Psychiatric Hospital of the Commonwealth of Puerto Rico, only to have them returned to the institution on even date. This revertion occurs because there may not be sufficient beds at the Hospital to accept these patients. That does not constitute an excuse. There are other facilities, including private facilities, in the Commonwealth of Puerto Rico where these seriously mentally ill can be treated.

maintain the records. It also presupposes the existence of laboratory testing for basic purposes such as the determination of tuberculosis and venereal disease, as well as X–ray equipment. Physical examinations must be taken by trained personnel who take their own personal histories and do not rely upon the inmates who may have varying degrees of literacy, to fill out forms.

Not only must there be medical screening of the inmates, there must also be psychiatric screening to determine which inmates are so seriously ill as to require hospitalization in a psychiatric facility outside the Administration of Correction and to determine which require treatment and the intensity of such treatment within the penal institutions. Psychiatric examinations presuppose trained personnel under the supervision of qualified psychiatrists. The Court is not in a position to direct the institutions that they must employ so many psychiatrists and so many psychologists or so many psychiatric nurses or psychiatric social workers, but it should be obvious to all that housing 4,200 persons and accepting responsibility for their medical and psychiatric well–being makes it obligatory that the Administration of Correction place the medical care under the supervision of a full–time medical director who has as his assistant a full–time director of psychiatric services.

Medical and psychiatric screening of just the incoming inmates will not alleviate the medical problems. A complete screening of the penal population must be done at once. Teams of doctors and nurses may be necessary, but the health and lives of the inmates can no longer be left to blind chance. The authorities must know which inmate is diabetic, which has a kidney problem, which a respiratory infection, as well as which has a communicable disease.

Each inmate who enters the penal population or the pretrial detainee population of the facilities operated by the Administration of Correction is entitled to continue to receive any life–supporting medication, prescription or special diet that he had in civilian life. Each inmate has the right to receive medications, prescriptions and diets as they have been prescribed by a physician while the inmate is incarcerated. It may prove more cost effective to locate such prisoners in a single unit, but that is not the concern of the Court.

It should be apparent from all of the reported opinions in this field that the conditions under which prisoners and pretrial detainees are kept in Puerto Rico are barbaric by any legal standard. The overcrowding appears worse than in any other reported decision, and the sanitation and public health standards employed are among the poorest that one could imagine. The Court is not going to order that all the prisons in Puerto Rico be closed. When La Princesa was closed, the description of the conditions as they existed there does not impress the Court as being worse than what was seen in the films and photographs concerning the remaining facilities in the Commonwealth of Puerto Rico.

The Court also will not appoint a Master to operate the facilities at this time. The failure of the officials of the Commonwealth of Puerto Rico to perform the duties imposed upon them by statute and the Constitution is more than casual indifference. It approaches a deliberate attempt to inflict pain and suffering. Nevertheless, without foreclosing the possibility of such an appointment in the future, or of any other remedy that may be necessary, the Court is of the opinion that the Commonwealth officials must learn to run their own prisons.

The conditions cannot be corrected overnight. However, constitutional rights cannot be delayed because the correction of certain conditions is either difficult or costly. Throughout the hearing, the defendants have tried to assure the Court that the conditions were being remedied and that with the opening of the State Penitentiary in July many of the plaintiffs' complaints would disappear. July has come and gone and the State Penitentiary has not opened. The only other planned construction for which appropriations are made are at Fajardo and a new young adult detention center at the Zarzal prison camp. The Court

does not believe that these additions will alleviate the overcrowding pressure.[32]

The prisons will have to be kept in a cleaner and more sanitary condition, or in a condition which does not represent an environmental control problem on the outside and a public health problem in the inside. Prisoners cannot live in the overcrowded conditions in which they now live. Although the Court does not think it is sufficient, for temporary purposes, within a period not to exceed six months, each prisoner in Puerto Rico shall be provided with at least 35 square feet of space for himself and his belongings. The 35 square feet of space may not be halved by the mere expedient of doubled tiered bunking in dormitories.

The following order is entered as an emergency order for temporary and provisional relief. It is merely a stopgap to comply with what the defendants' expert stated were the goals of a prison system from a health standpoint. He said that the primary purpose was to prevent death; secondly, to prevent disease; thirdly, to prevent disability; then to prevent disruption of the Administration or flow of services; to prevent dissatisfaction among the inmates; and finally, to prevent discomfort. As the prison system in Puerto Rico now functions, it prevents none of these things. It is therefore,

ORDERED, that all "calabozos" or dungeons or isolation cells in each of the closed institutions operated by the Administration of Correction be and hereby are closed; and it is further

ORDERED, that no such similar cells shall be constructed or used in any facility operated by the Administration of Correction; and it is further

ORDERED, that all persons presently confined in a "calabozo" cell because they are mentally unfit and all persons presently confined in the unit known as Lower Maximum 1 (Máxima de Locos), at Bayamón Regional Institution, be forthwith transferred to psychiatric hospitals; and it is further

ORDERED, that all persons presently confined in the unit known as the "psychiatric module" of D–1–C Lower at the Bayamón Regional Institution or in the dormitories for the mentally ill at Aguadilla (Galera de Locos), or any other person confined in any other ward or any facility operated by the Administration of Correction and labeled as mentally unfit, be examined by a qualified psychiatrist within ten (10) days from the date of this Order to determine whether said psychiatrist recommends treatment of such persons in a psychiatric hospital, or whether treatment can be continued under proper psychiatric guidance within the penal institutions; and it is further

ORDERED, that henceforth and from the date of this Order, neither the Administrator of Correction nor any person operating as an employee, servant, agent or contracting party with the Administration of Correction, may place known psychotics or severely mentally ill persons in any isolation cell or in any other cell or dormitory or ward, without constant attention and medical care, and shall, if the medical conditions so warrant, transfer such inmate to a psychiatric hospital; and it is further

ORDERED, that not later than September 22, 1980, the defendants, or any of them, shall notify the Court that a full–time medical director has been appointed for not less than one year; and it is further

ORDERED, that if the defendants do not appoint a medical director within said time, the Court, as a provisional measure only, will appoint a medical director to serve until a full–time, permanent director is appointed by the defendants; and it is further

---

**32.** The Court has taken judicial notice of the fact that the Legislature of Puerto Rico has passed a revised penal code which adopts obligatory sentencing and modified determinate sentencing. Without passing judgment on the legislation, experience teaches us that obligatory sentencing radically increases prison population and determinate sentencing inevitably leads to prisoners remaining in jail for longer periods of time. No appropriations have been made for the facilities that will be needed to house the large influx of prisoners in the immediate future.

ORDERED, that the medical director appointed shall forthwith institute unified plans and procedures for the maintenance of medical records, standardize the contents of medical records and order that all information of a medical nature, including history, physical examination, laboratory tests and their results, X–rays and their results, diagnoses, doctors' orders, prescriptions and medications given, inter alia, be included in each such record; and it is further

ORDERED, that the medical director appointed shall be empowered to employ such staff of professionals, be they doctors, nurses, paramedics, psychiatrists, psychologists, psychiatric nurses, psychiatric social workers, dentists and dental hygienists as may be necessary to provide adequate medical care and attention to the entire penal population; and it is further

ORDERED, that within one week from his appointment, the medical director shall establish procedures for the medical screening of each incoming pretrial detainee or prisoner, which shall include a complete physical examination and such tests as may be necessary to diagnose tuberculosis, venereal disease, epilepsia, diabetes, chronic kidney disease, or any communicable disease; and it is further

ORDERED, that from the commencement of the screening of all incoming inmates, each inmate shall be screened medically and psychologically within one week from the date of his entry into the custody of the Administration of Correction of the Commonwealth of Puerto Rico; and it is further

ORDERED, that among the persons to be employed by the medical director shall be a psychiatrist who shall be in charge of the psychiatric care for emotionally and mentally disturbed inmates; and it is further

ORDERED, that the psychiatrist in charge employed by the medical director shall forthwith establish procedures for the psychiatric screening of all incoming inmates into the facilities operated by the Administration of Correction; and it is further

ORDERED, that those incoming inmates who require hospital treatment in a psychiatric institution shall be transferred thereto and that those incoming inmates who require intensive psychiatric treatment shall have such treatment provided as is necessary; and it is further

ORDERED, that the psychiatric screening of all incoming inmates shall commence within one week from the appointment of the psychiatrist in charge, whose appointment shall be made within one week of the appointment of the medical director; and it is further

ORDERED, that within two months from the date of this Order the medical director shall cause the entire existing population in the custody of the Administration of Correction to be screened with a complete physical examination and psychiatric examination for the detection of any chronic disorder or any communicable disease; and it is further

ORDERED, that the screening of the entire population of the facilities operated by the Administration of Correction shall be completed within three months of the date it is commenced; and it is further

ORDERED, that the Administration of Correction shall provide to each incoming inmate, whether pretrial detainee or convicted person, soap, towels, toothpaste and toothbrush, commencing immediately; and it is further

ORDERED, that the Administration of Correction shall provide all presently confined pretrial detainees and convicted persons, soap, towels, toothpaste and toothbrush, and that such items shall be completely distributed within sixty (60) days from the date of this Order; and it is further

ORDERED, that all food handlers shall be required to have had a physical examination and tests for tuberculosis or venereal disease; and it is further

ORDERED, that such examinations shall be provided to food handlers hereafter so that no food handler shall be more than six (6) months on job duty without such an examination; and it is further

ORDERED, that all food handlers be provided caps or hairnets for use while handling foods; and it is further

ORDERED, that the Administration of Correction shall immediately repair the plumbing and sewage system at the Bayamón Regional Institution; and it is further

ORDERED, that a report concerning said repairs shall be filed with this Court within one month from the date of this order; and it is further

ORDERED, that the Administrator of Correction shall, at the time of filing said report, also report on the repairs and modifications of the sanitary and sewage system of all other closed institutions and any other steps taken to improve said conditions; and it is further

ORDERED, that the Administrator of Correction take the necessary steps to insure that each inmate, whether prisoner or pretrial detainee, be afforded no less than thirty five (35) square feet of living and sleeping space. This goal of 35 square feet per inmate shall be achieved in stages as necessary within six (6) months from the date of this order; and it is expressly provided that said space requirement of 35 square feet is a temporary measure only; and it is further

ORDERED, that plans shall be submitted within ninety (90) days from the date of this Order showing the steps the Administration of Correction is taking to provide no less than 70 square feet per individually celled inmate and 55 square feet for inmates housed in dormitories, provided that said space limitations be accompanied by detailed plans for time out of cells by the inmates in restricted dormitories; and it is further

ORDERED, that henceforth no inmate or pretrial detainee shall be denied any medication prescribed by a qualified physician, nor shall any inmate be denied a special diet prescribed by a qualified physician, unless said prescription is rescinded for medical reasons by the medical director appointed; and it is further

ORDERED, that the injunction ordered herein is considered to be a claim separate and apart from other claims, including those for costs and attorneys' fees within the context of Rule 54(b) of the Federal Rules of Civil Procedure.

There is no just reason for delay, and the Clerk of this Court is instructed to enter this Opinion and Order forthwith as a judgment so that this Order be made immediately appealable.

This Court shall maintain continuing jurisdiction over the enforcement of these Orders, and in order to permit the plaintiffs an opportunity to contest any report or statement filed by the Administration of Correction, it is

ORDERED, that the seven plaintiffs' attorneys who appeared at trial shall be permitted to enter into any of the institutions operated by the Administration of Correction and to confer with their clients and to inspect any of the conditions covered in this Order.

IT IS SO ORDERED.